

**FILED**
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TENN.

OCT 11 2022

Jm
_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:22-cr-00329 |
| v. | ) | |
| | ) | 18 U.S.C. § 371 |
| | ) | |
| CHRISTIAN O. QUIROZ | ) | **FILED UNDER SEAL** |

# INFORMATION

THE UNITED STATES ATTORNEY CHARGES:

## INTRODUCTION

At all times material to this Information:

1. "America's United Financial, LLC, and Affiliates" was a business that was made up of nine used car dealerships (the "Dealerships") and six related finance companies ("RFCs") located in and around Nashville, Tennessee (collectively, "Auto Masters").

2. M.J., an individual known to the United States Attorney, was the CEO of Auto Masters. M.J. owned a one hundred percent (100%) share of two of the Auto Masters Dealerships and a one hundred percent (100%) share of one of the Auto Masters RFC's. M.J. owned a fifty-one percent (51%) share of each of the remaining Auto Masters Dealerships and each of the remaining Auto Masters RFC's.

3. R.J., an individual known to the United States Attorney, was M.J.'s brother. R.J. owned a minority interest (less than 50%) in three of the Auto Masters Dealerships and in one Auto Masters RFC.

4. S.P., an individual known to the United States Attorney, was a Certified Public Accountant. He was the CFO of all the Auto Masters entities and prepared the tax returns for the Auto Masters entities and for M.J. personally.

5. The Dealerships sold used cars and provided car loans in connection with those sales. When a customer purchased a vehicle from a Dealership, the customer and the Dealership entered into a car loan agreement. Under the terms of the car loan agreement, the customer was required to make a down payment and to make regular payments (once or twice per month) on the loan until it was paid in full. The Dealership then sold the car loan to the associated RFC, and after that, the RFC owned the car loan. The Dealership collected the car loan payments from the customer and then gave those payments to the associated RFC.

6. **CHRISTIAN O. QUIROZ** was the loan portfolio and collection manager for Auto Masters. In that role, he was responsible for managing the collections department and was the administrator for the company's electronic database, which was called AMS. As the administrator, he controlled user logins and passwords, and had the ability to control which users could view and access information within the AMS system.

7. In approximately 2013, Auto Masters had a line of credit with Capital One National Association ("Capital One") and First Tennessee Bank ("First Tennessee") (collectively, the "LOC"). Capital One and First Tennessee were each a "financial institution" with deposits insured by the Federal Deposit Insurance Corporation ("FDIC"), within the meaning of Title 18, United States Code, Section 20, and for purposes of Title 18, United States Code, Section 1344.

8. A line of credit is like a loan that is extended to a borrower. The borrower is required to provide collateral in order to get the line of credit. Then, the borrower is allowed to take certain amounts of money as "draws" against of the line of credit, which the borrower is

required to repay to the lender. Between 2013 and 2017, the maximum principal balance on the LOC was increased at various times. By July 2017, the total amount available under the terms of the LOC was $63 million, and Auto Masters owed in excess of $62.9 million on the LOC.

9. The outstanding car loans held by the RFCs were used as collateral for the Auto Masters LOC. Auto Masters was allowed to take draws on the LOC in an amount of up to 65% of the total amount of "eligible loans." These "eligible loans" were the collateral for the LOC. They were also referred to as the "borrowing base" for the LOC. Each month, Auto Masters was required to give Capital One and First Tennessee a certified document that listed the total value of "eligible loans" that formed the "borrowing base." This certified document was referred to as the "borrowing base certificate."

10. According to the terms of the LOC, if a car loan was delinquent by 60 or more days, that loan was not an "eligible loan" and could not be used as part of the "borrowing base." When loans became delinquent, Auto Masters was supposed to subtract the value of those loans from total value of "eligible loans" on the "borrowing base certificate."

11. When a vehicle was sold and financed by Auto Masters, the associated car loan data was input into AMS. Car loan payments were also recorded in AMS. Customer service representatives at each Dealership were responsible for collecting payments on the car loans and for inputting that information into AMS. **CHRISTIAN O. QUIROZ**, R.J., and others provided consolidated loan data from AMS to S.P. so that S.P. could prepare the monthly "borrowing base certificates." S.P. then sent the "borrowing base certificates" to Capital One to report the total value of "eligible loans," which formed the collateral for the LOC.

12. S.P. was required to submit "borrowing base certificates" to Capital One each month. Per the terms of the LOC, Capital One and First Tennessee each funded a portion of those

"draws." In August 2017, S.P. submitted a "borrowing base certificate" to Capital One representing that as of July 31, 2017, the total value of "eligible loans" was $91,677,386.

13. S.P. periodically requested draws from Capital One based on the value of the collateral that was reported on the "borrowing base certificates." M.J. and S.P. were responsible for distributing funds from the draws on the LOC. By July 2017, Auto Masters owed Capital One in excess of $62.9 million under the LOC.

14. On October 9, 2017, S.P. emailed and caused to be emailed a "borrowing base certificate" to Capital One for the period ending September 31, 2017, disclosing that Auto Masters had previously overstated its collateral by over $33 million. In the "borrowing base certificate," Auto Masters admitted that it had drawn over $26.4 million more than Auto Masters was permitted to draw under the terms of the LOC.

15. On or about October 17, 2017, Auto Masters filed for bankruptcy. During the course of the bankruptcy proceedings, Capital One scheduled depositions of Auto Masters owners and employees. A deposition is a statement given under oath. Capital One sought to depose **CHRISTIAN O. QUIROZ**, but he left the jurisdiction.

16. During the bankruptcy proceedings, the bankruptcy receiver determined that as of July 31, 2017, Auto Masters had overstated its collateral by nearly $37 million, and that Auto Masters had drawn in excess of $24 million from Capital One based on that overstatement.

## COUNT ONE

17. Paragraphs 1 through 16 are re-alleged and incorporated by reference as though fully set forth herein.

18. From in or around at least 2013 and continuing through in or about April 2022, in the Middle District of Tennessee and elsewhere, **CHRISTIAN O. QUIROZ** did willfully,

knowingly, and unlawfully combine, conspire, confederate, and agree with M.J., R.J., S.P., and others known and unknown to the United States Attorney to commit certain offenses against the United States, that is: to commit bank fraud, in violation of Title 18, United States Code, Section 1344, by engaging in a scheme and artifice to defraud Capital One and First Tennessee to obtain moneys, funds, and property owned by, and under the custody and control of Capital One and First Tennessee by means of false or fraudulent pretenses, representations and promises.

## **PURPOSE OF THE CONSPIRACY**

19. It was the purpose of the conspiracy for **CHRISTIAN O. QUIROZ** and his co-conspirators, including M.J., R.J., S.P., and others known and unknown to the United States Attorney, to unlawfully enrich themselves by, among other things:

   A. Inputting false car loan payments in the AMS system for delinquent car loans to make it appear as though those car loans were not delinquent by more than 60 days;

   B. Fraudulently including those delinquent car loans on the "borrowing base certificates" that were submitted to Capital One, well knowing that those car loans were not "eligible loans" and that they should not have been included in the total value of "eligible loans" reported on the "borrowing base certificates";

   C. Submitting those false "borrowing base certificates" to Capital One to make it appear as though there was more collateral for the LOC than there actually was;

   D. Requesting draws from the LOC in excess of the legitimate collateral;

   E. Diverting proceeds of the fraud for their personal use and benefit, the use and benefit of others, and to further the conspiracy; and

   F. Taking steps to conceal the fraud.

## MANNER AND MEANS

20. The manner and means by which **CHRISTIAN O. QUIROZ** and his co-conspirators, including M.J., R.J., S.P., and others known and unknown to the United States Attorney, sought to accomplish the purpose of the conspiracy included, among other things, the following:

   A. S.P., **CHRISTIAN O. QUIROZ**, R.J., and others, identified car loans that were more than 60 days delinquent. S.P. and M.J. then directed **QUIROZ** to post or cause others to post false payments in the AMS system for the delinquent car loans to make it appear as though those car loans were not delinquent by more than 60 days.

   B. At the direction of M.J. and S.P., **CHRISTIAN O. QUIROZ** made or caused others to make further false entries in AMS to falsely and fraudulently increase the total value of the "eligible loans" that made up the "borrowing base." For example, **QUIROZ** created false loans based on duplicate Vehicle Identification Numbers ("VIN numbers"), vehicles that had been repossessed, vehicles that had been paid off, and using information from customers who had applied for loans at Auto Masters, but whose loans had been turned down.

   C. With help and advice from **CHRISTIAN O. QUIROZ**, R.J. made or caused others to make false payments in AMS that made it appear as though car loans at Dealerships and an RFC that R.J. owned were not delinquent.

   D. **CHRISTIAN O. QUIROZ** concealed the falsified loans by using his administrator privileges to restrict user access in AMS so that only certain individuals, including M.J., R.J., and S.P., could see the fraudulent loans.

E. **CHRISTIAN O. QUIROZ** provided the falsified loan information from AMS to S.P. so that S.P. could prepare "borrowing base certificates" to submit to Capital One.

F. S.P. submitted the false information to Capital One, knowing that the "borrowing base certificates" were fraudulent because the total value of the "eligible loans" reported on those certified documents was false.

G. The co-conspirators communicated with each other and others about the fraud in person, on the phone, and over email or by text message.

H. **CHRISTIAN O. QUIROZ**, S.P., and others created spreadsheets that recorded the false loans, the real loans, or both, in furtherance of the fraud. **QUIROZ** and S.P. shared those spreadsheets among themselves and with M.J.

I. **CHRISTIAN O. QUIROZ** and his co-conspirators took steps to conceal the fraud.

## OVERT ACTS

21. In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in the Middle District of Tennessee and elsewhere, at least one of the following overt acts, among others:

A. On or about May 12, 2016, **CHRISTIAN O. QUIROZ** made or caused to be made a false entry into the AMS system that purported to be a car loan payment in the amount of $420 on Loan No. B6168.

B. On or about May 27, 2016, **CHRISTIAN O. QUIROZ** sent an email to S.P. and M.J. discussing actions the co-conspirators were taking in furtherance of the fraud and attaching a spreadsheet.

C. On or about June 15, 2016, S.P. signed a "borrowing base certificate" for the month ending May 31, 2016, and submitted it to Capital One, knowing that the "borrowing base certificate" was fraudulent because the total value of "eligible loans" was false.

D. On or about February 14, 2017, **CHRISTIAN O. QUIROZ** made or caused to be made a false entry into the AMS system that appeared to be a car loan payment in the amount of $430 on Loan No. B6168.

E. On or about March 18, 2017, **CHRISTIAN O. QUIROZ** sent an email to S.P. discussing actions the co-conspirators were taking in furtherance of the fraud and attaching a spreadsheet.

F. On or about April 3, 2017, S.P. emailed to Capital One a "borrowing base certificate," for the month ending February 28, 2017, knowing that the "borrowing base certificate" was fraudulent because the total value of "eligible loans" was false.

G. On or about April 5, 2017, S.P. sent an email to Capital One requesting a draw in the amount of $400,000 and attaching a false "borrowing base certificate" that S.P. signed on April 5, 2017.

H. On or about July 12, 2017, **CHRISTIAN O. QUIROZ** made or caused to be made a false entry into the AMS system that appeared to be a car loan payment in the amount of $450 on Loan No. B6168.

I. On or about August 2, 2017, S.P. emailed a spreadsheet to **CHRISTIAN O. QUIROZ**, titled "Paper spread 6-15-17 (Westlake).xlsx," which contained only the "real loans" (unfalsified loans) in the amount of approximately $60 million. S.P. asked **QUIROZ** to update the spreadsheet with "new paper originated that can be sold."

J.  On or about August 21, 2017, S.P. emailed a "borrowing base certificate" to Capital One, for the month ending July 31, 2017, knowing that the "borrowing base certificate" was fraudulent because the total value of "eligible loans" was false.

K.  In or about October 2017, M.J. paid **CHRISTIAN O. QUIROZ** a sum of approximately $18,000 to leave the district so that **QUIROZ** would not implicate M.J. in the Bankruptcy proceeding.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

22.  The allegations of this information are re-alleged and incorporated by reference as though fully set forth herein for purposes of alleging forfeiture to the United States of certain property in which the defendant has an interest.

23.  Upon conviction of this Information, **CHRISTIAN O. QUIROZ** shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to a violation Title 18, United States Code, Section 371, including the underlying specified unlawful activity of Title 18, United States Code, Section 1344 (bank fraud), pursuant to Title 18, United States Code, Section 981(a)(1)(C) and 28 United States Code, Section 2461. The property subject to forfeiture includes, but is not limited to, a money judgment representing the proceeds of the scheme and artifice to defraud as charged in this Information.

24.  If any of the above-described forfeitable property, as a result of any act or omission of **CHRISTIAN O. QUIROZ**:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property, and it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) to seek forfeiture of any other property of **CHRISTIAN O. QUIROZ**, up to the value of said property listed above as subject to forfeiture.

MARK H. WILDASIN
UNITED STATES ATTORNEY

*/s/ Kathryn W. Booth*

KATHRYN W. BOOTH
ASSISTANT UNITED STATES ATTORNEY

*/s/ Thomas Jaworski*

THOMAS JAWORSKI
ASSISTANT UNITED STATES ATTORNEY

By Kathryn Booth by permission